IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 21-90 |
| | ) | |
| ABDULLAH K. WOODS, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION**

Robert J. Colville, United States District Judge

Before the Court is the Motion to Suppress Evidence ("Motion to Suppress") (ECF No. 38) filed by pro se Defendant Abdullah K. Woods. Mr. Woods moves to suppress evidence obtained as a result of a search of the residence of Mesha Woods, Mr. Woods' sister-in-law. This evidence was discovered by police officers in a light blue backpack that was located on the ground floor closet of Mesha Woods' apartment, and included: (1) the automobile key for a light blue Dodge Grand Caravan that Mr. Woods had been driving when he previously fled a traffic stop; (2) a brown leather card holder containing Mr. Woods' debit card, work identification, and health insurance card; (3) two firearms; (4) a quantity of cocaine and cocaine base. *See* Resp. 2, ECF No. 51; Suppression Hearing Transcript (hereinafter "Tr.") 38:12-23. ECF No. 58.

For the reasons that follow, the Court will deny the motion.

**I.    Background**

On December 9, 2020, a Criminal Complaint (ECF No. 3) was filed in this matter asserting that there was probable cause to believe that Mr. Woods had, on December 7, 2020, illegally possessed a firearm in violation of 18 U.S.C. § 922(g)(1). On December 15, 2020, Stephen F.

1

Capone, Esquire was appointed to represent Mr. Woods pursuant to the provisions of the Criminal Justice Act, 18 U.S.C. §3006A. ECF No. 9. Mr. Woods had his initial appearance in this case on December 16, 2020. ECF No. 10. Following a detention hearing on December 22, 2020, Magistrate Judge Lisa Pupo Lenihan entered an Order of Detention Pending Trial (ECF No. 16).

On March 2, 2021, Mr. Woods was charged in a one-count Indictment with possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Arraignment took place before Judge Lenihan on March 18, 2021. At the arraignment, the Court entered a plea of not guilty on Mr. Woods' behalf, and noted "Defendant refused to participate" and "Counsel [for Defendant] not permitted to respond due to client instruction." ECF No. 26. On the Certification and Notice for Filing Pretrial Motions (ECF No. 27), the "Attorney for Defendant" signature line indicates: "Stephen Capone was advised of the deadline. Defendant would not permit him to certify." ECF No. 27.

On March 19, 2021, Attorney Capone filed a Motion for Leave to Withdraw Appearance, for a Farretta Hearing, and for an Extension of Time to File Pretrial Motions (ECF No. 28). The Court convened a hearing on March 31, 2021 to address Attorney Capone's Motion, and to further inquire as to whether Mr. Woods intended to waive his right to counsel in this matter. At the hearing, the Court engaged in a lengthy and comprehensive colloquy with Mr. Woods with respect to his Sixth Amendment right to counsel, and whether his waiver of the same was knowing and voluntary. The Court ultimately found that Mr. Woods, through his expressed intentions and through his conduct, waived his Sixth Amendment right to representation in this matter. The Court also granted in part Attorney Capone's Motion to Withdraw as Attorney, and held that Mr. Capone will remain assigned in this matter in the role of "Standby Counsel." ECF No. 34.

Mr. Woods filed his Motion to Suppress on April 14, 2021.  A Superseding Indictment (ECF No. 40) was filed on April 27, 2021.  In the Superseding Indictment Mr. Woods is charged with: (1) possession of a firearm and ammunition by a convicted felon, in violation of Title 18, United States Code, Section 922(g)(1); (2) Possession with Intent to Distribute 28 Grams or More of a Mixture and Substance Containing a Detectable Amount of Cocaine Base, in the form Commonly known as Crack, and a Quantity of a Mixture and Substance Containing a Detectable Amount of Cocaine in violation of Title 21, United States Code, Sections 841(a)(l), 841(b)(l)(B)(iii), and 841(b)(l)(C); and (3) Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of Title 18, United States Code, Section 924(c)(l)(A)(i).  The Government filed its Response (ECF No. 51) to Mr. Woods' Motion on June 3, 2021, and Mr. Woods filed a Reply (ECF No. 52) on June 22, 2021.

The Court held an evidentiary hearing on the Motion to Suppress on July 20, 2021.  Before commencing the hearing, the Court again explained the implications of Mr. Woods' decision to waive his Sixth Amendment right to counsel, and further informed Mr. Woods of the potential penalties associated with the charges set forth in the Superseding Indictment.  Tr. 2:17-6:21, ECF No. 58.  The Court asked Mr. Woods if it was still his intention to represent himself and to continue to waive his Sixth Amendment right to counsel in this matter, to which the Defendant responded: "Yes, sir."  *Id.* at 7:1-8.

During the hearing on the Motion to Suppress, police officers Justin Toth, Ross Weimer, and Derek Stitt testified for the Government.  The Government also introduced the following Exhibits: (1) a Transcript of the April 27, 2021 sworn testimony of Mesha Woods before the Grand Jury ("Government's Ex. 1") (ECF No. 54-2); (2) a McKeesport Police Department Miranda Rights Warning Form bearing three signatures ("Government's Ex. 2") (ECF No. 54-3); (3) a

McKeesport Police Department Voluntary Consent to Search Form bearing four signatures ("Government's Ex. 3") (ECF No. 54-4); (4) an audio recording of an April 28, 2021 phone call between Mr. Woods and Mesha Woods ("Government's Ex. 4"); (5) an audio recording of a subsequent April 28, 2021 phone call between Mr. Woods and Mesha Woods ("Government's Ex. 5"). In support of his Motion to Suppress, Mr. Woods called Mesha Woods to testify. At the end of the evidentiary hearing, the evidentiary record for the Motion to Suppress was deemed complete.

Following the hearing, Mr. Woods filed post-hearing Proposed Findings of Fact and Conclusions of Law (ECF No. 56) on August 19, 2021 and a Supplemental Brief in Support (ECF No. 59) of the same on September 13, 2021. The Government filed post-hearing Proposed Findings of Fact and Conclusions of Law (ECF No. 60) on September 20, 2021. Mr. Woods filed a Reply (ECF No. 61) to the Government's Proposed Findings of Fact and Conclusions of Law on October 1, 2021. The matter is now ripe for disposition.

**II.     Factual Findings**

"On a motion to suppress evidence, the trial judge sits as the finder of fact." *United States v. France*, 414 F. Supp. 3d 747, 750 (W.D. Pa. 2019) (citing *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)). Accordingly, a district court judge assesses the credibility of witnesses, weighs the evidence, and draws any appropriate conclusions and inferences from the evidence. *Id.*

As noted above, the Government called Officer Toth, Officer Weimer, and Officer Stitt, each of whom was employed by McKeesport Police Department at the time of the search and seizure at issue in the Motion to Suppress and each of whom was involved in some capacity with the search and seizure, to testify at the suppression hearing. The Officers testified about the events

leading up to Mr. Woods' arrest, as well as the search of Mesha Woods' apartment, Apartment 14D of the Harrison Village apartment complex, that resulted in the seizure of the backpack containing the evidence Mr. Woods now seeks to suppress.  Mr. Woods called Mesha Woods to testify as to the circumstances surrounding the search of her apartment, as well as her relationship to Mr. Woods and the circumstances surrounding Mr. Woods' presence in the apartment on the night in question.  This testimony, coupled with the Government's documentary evidence, provides the factual record that the Court considers when deciding Mr. Woods' Motion to Suppress.

Based upon the Court's experience, and personal observation of the Officers' testimony and demeanor as witnesses, and in light of the Court's consideration of the Officers' testimony in the context of all of the admissible evidence before the Court, the Court finds and concludes, broadly, that the Officers testified credibly.  The Court further finds and concludes that Mesha Woods, generally speaking, testified credibly, but notes that the Government's questioning of Ms. Woods, as well as the documentary evidence introduced by the Government, revealed significant and material weaknesses in her testimony that causes the Court to question the weight given to certain portions of her testimony, more specifically identified in the Court's analysis below.

Initially, the search and seizure at issue took place on the night of December 7, 2020 into December 8, 2020. Mot. to Suppress 1, ECF No. 38.  There is seemingly no disagreement that, on the night in question, Mr. Woods fled a traffic stop in a Dodge Grand Caravan and was pursued by officers from Duquesne Police Department, who eventually lost track of Mr. Woods.  *See* Tr. 23:10-24:14, ECF No. 58; Reply 1-2, ECF No. 52.  Officer Toth, then of the McKeesport Police Department, was notified over Allegheny County dispatch of this pursuit, which was heading into the City of McKeesport from Duquesne.  Tr. 23:10-24:14, ECF No. 58.  Officer Toth and other

McKeesport officers searched the McKeesport area for the Dodge Grand Caravan and eventually located the vehicle near the 14 building of Harrison Village, a housing complex in McKeesport, with the van's lights still on and smoke emanating from the hood of the vehicle. *Id.* at 24:10-25:12. Upon being informed of the fact that Mr. Woods was the individual who had been driving the vehicle, Officer Weimer informed Officer Toth that Officer Weimer had prepared a report at some point in the past, and that "[Officer Weimer] was familiar with Mr. Woods in that [Mr. Woods] is known to frequent 14D, Apartment D" of Harrison Village. *Id.* at 25:13-25.

As the officers approached Apartment 14D, Mesha Woods opened the front door, at which time Officer Toth asked Ms. Woods if anyone else was inside of the apartment. Tr. 26:1-27:21. Mesha Woods responded by stating that the only people in Apartment 14D were herself and her three children. *Id*. Officer Toth informed Mesha Woods that the officers were pursuing an actor they believed had entered Apartment 14D, and that the officers would review surveillance footage to determine the same. *Id.* at 27:22-28:9. At that time, Mr. Woods emerged from Apartment 14D with his hands up, and was detained, handcuffed, and put into a patrol vehicle. *Id*. Mesha Woods testified that she was surprised by Mr. Woods' exit from her apartment because she was unaware, up until that point, that Mr. Woods was inside of Apartment 14D on the night in question. *Id.* at 61:12-15; Government's Ex. 1 12:9-20, ECF No. 54-2.

Mesha Woods and her children are the lessees of Apartment 14D of Harrison Village, and Mesha Woods, her husband, Omar, and their children are the only residents/occupants of Apartment 14D. Tr. 23:10-24:14, ECF No. 58; Government's Ex. 1 5:3-6:13, ECF No. 54-2. Defendant Abdullah Woods resides in Detroit, Michigan. Government's Ex. 1 7:14-15, ECF No. 54-2. Mesha Woods has further testified that Mr. Woods does not possess a key to Apartment 14D, does not pay rent or utility, cable, or internet bills for the apartment, and does not keep

possessions at the apartment when he is not physically present in the apartment. Tr. 56:25-59:24, ECF No. 58; Government's Ex. 1 6:8-7:10, ECF No. 54-2. During the timeframe relevant herein, Mr. Woods was in town from Michigan visiting relatives. Government's Ex. 1 7:11-8:18, ECF No. 54-2. While Mr. Woods had visited Apartment 14D earlier in the day on December 7, 2020 and had stayed at Apartment 14D in the past, *id.* at 8:8-25, Mesha Woods testified unequivocally that Mr. Woods was not staying there that night and that she did not expect him to be staying there that night, *id.* at 8:1-25, 16:8-12; Tr. 57:12-60:17, ECF No 58. Mesha Woods also testified:

> Q. You said he was coming back later that night. How come you told officers that you were the only people who were there, he wasn't supposed to be there?
>
> A. He wasn't supposed to be there whenever we were all going to bed. My husband wasn't there and he wasn't there whenever I put my kids to bed.

Tr. 58:2-7, ECF No. 58. Mesha Woods also testified that Mr. Woods "didn't have to be invited that specific night." Tr. 58:20-59:2, ECF No. 58.

Following Mr. Woods' arrest, Officer Toth continued to speak with Mesha Woods. During this conversation, all officers' weapons were holstered. Tr. 28:6-29:7, ECF No. 58. During this conversation, Mesha Woods appeared to Officer Toth to be sober and of clear mind, exhibited no slurred speech, and showed no sign of intoxication or that she was under the influence of any narcotic. *Id.*[1] Meesha Woods was provided with a Miranda Rights Warning Form, and she subsequently initialed next to each paragraph and signed the Form, which was also signed by Officer Toth and Officer Weimer as the "Officer" and "Witness," respectively. *Id.* at 29:4-32:2; Government's Ex. 2, ECF No. 54-3.

Officer Toth next asked Mesha Woods if she would permit officers to search her residence, and Officer Toth testified that he informed Ms. Woods that she had the right to refuse any search,

---

[1] This is corroborated by the testimony of Officer Weimer and the testimony of Officer Stitt. *See* Tr. 41-48; 49-51.

7

and that, in the event of refusal, Officer Toth would apply for and attempt to obtain a search warrant for the residence. Tr. 31:25-32:8, ECF No. 58. Each of the Officers testified that the conversation surrounding the Voluntary Consent to Search Form was cordial and non-confrontational. *Id.* at 36:13-23, 45:22-46:2, 50:8-12. The Officers also testified that no threats, pressures, coercion, or promises were made to Mesha Woods during the conversation as to whether she would consent to a search of Apartment 14D. *Id.* at 36:24-37:11, 47:3-12, 50:20-51:17. Officer Toth testified that, prior to Mesha Woods signing the Voluntary Consent to Search Form, Officer Toth explained to Ms. Woods that anything found in the residence would be charged accordingly, and that the officers were mandated reporters that were required to report anything that placed children in danger, and that he explains the same so that the individual understands the scope of the consent to search that is being requested by officers. *Id.* at 33:2-34:7. Mesha Woods signed a Voluntary Consent to Search Form for Apartment 14D. Government's Ex. 3, ECF No. 54-4. The Form provided that "I am giving this written permission voluntarily and without threats, pressures, coercion, or promises of any kind being made to me." *Id*. The Form was also signed by Officer Toth and Officer Stitt as "Police Officer[s]" and by Officer Weimer as a "Witness." *Id*.

Following the signing of the Voluntary Consent to Search Form, Mesha Woods and her children left the apartment and went to a neighbor's home prior the commencement of the search. Tr. 35:11-18, ECF No. 58. The search took approximately twenty-five minutes, during which Mesha Woods did not revoke consent and did not ask the officers to stop the search. *Id.* at 35:11-18 39:13. Officer Toth is the officer who located the backpack containing, inter alia, two firearms, a quantity of cocaine and crack cocaine, and identification belonging to Mr. Woods. *Id.* at 38:16-23. Upon completion of the search, Mesha Woods and her children returned to Apartment 14D,

and Ms. Woods did not, at that time, lodge an objection to the search or attempt to revoke consent to the search. *Id.* at 39:2-13.

### III. Discussion

Mr. Woods moves to suppress the evidence obtained via the warrantless search of Mesha Woods' apartment. Mr. Woods avers that Mesha Woods' consent was obtained through coercion and threats, and that her consent was thus not voluntary. Mot. to Suppress 1, ECF No. 38. The Government argues that the Motion to Suppress should be denied because Mr. Woods lacks standing to challenge the search at issue in this case because he did not have a legitimate expectation of privacy in Apartment 14D on the night in question, and further argues that the Motion should be denied because the search was proper because it was conducted pursuant to the written and voluntary consent of Mesha Woods, the lessee of the apartment. Government's Response 1, ECF No. 51.

The Fourth Amendment protects individuals from "unreasonable searches and seizures" of their "persons, houses, papers, and effects." U.S. Const. amend. IV. Subject to certain exceptions, evidence obtained through unreasonable searches and seizures must be suppressed as "fruit of the poisonous tree." *United States v. Bey*, 911 F.3d 139, 144 (3d Cir. 2018); *see also Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). The protection against unreasonable searches and seizures, however, is "triggered only if the state invades an area in which the person has a 'constitutionally protected reasonable expectation of privacy.'" *United States v. Donahue*, 764 F.3d 293, 298 (3d Cir. 2014) (quoting *New York v. Class*, 475 U.S. 106, 112 (1986)).

"[A] defendant moving to suppress evidence seized in a search 'bears the burden of proving not only that the search . . . was illegal, but also that he had a legitimate expectation of privacy' in the subject of the search." *Donahue*, 764 F.3d at 298 (quoting *Rawlings v. Kentucky*, 448 U.S. 98,

104 (1980)). "The latter inquiry turns on two specific questions: '(1) whether the individual demonstrated an actual or subjective expectation of privacy in the subject of the search or seizure; and (2) whether this expectation of privacy is objectively justifiable under the circumstances.'" *Id.* at 298-99 (quoting *Free Speech Coal., Inc. v. Att'y Gen.*, 677 F.3d 519, 543 (3d Cir. 2012)) .

"[I]n some circumstances a person may have a legitimate expectation of privacy in the house of someone else." *Minnesota v. Carter*, 525 U.S. 83, 89 (1998) "[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Carter*, 525 U.S. at 90. "In most cases, a person's 'status as an overnight guest is alone enough to show that he had an expectation of privacy in the home.'" *United States v. Coles*, 264 F. Supp. 3d 667, 678 (M.D. Pa. 2017). "Several factors guide this assessment, including, inter alia, whether and how often the person spent the night, whether the person had a key, whether the premises were habitable, and whether the person stored personal belongings or overnight accoutrements in the place." *Id.*; *see also United States v. Rose*, 613 F. App'x 125, 129–30 (3d Cir. 2015) (considering whether the defendant had a possessory interest in any part of the apartment, whether he stored any clothing or property at the apartment, whether he had a key to the apartment, whether he had permission to be at the apartment without the lessee's presence or consent, whether he received mail at the apartment, whether other guests had common access to the areas in the apartment occupied by him, whether he had the ability to and made no effort to exclude others from any part of the apartment, the defendant's relationship to the lessee, and the frequency with which he visited the apartment).

Upon consideration of the entire record presently before the Court, the Court finds that Mr. Woods has simply not carried his burden of establishing a legitimate expectation of privacy in Mesha Woods' apartment on the night in question. Even if Mr. Woods had a subjective

expectation of privacy in Mesha Woods' apartment on the night in question, he did not prove that such an expectation of privacy is objectively justifiable under the circumstances of the events of the night in question.

The evidence of record indicates that Mr. Woods, far from constituting an overnight guest, was present in Mesha Woods' apartment on the night in question (1) seemingly, only very temporarily, and (2) much more materially, plainly without Ms. Woods' knowledge or express permission. Mr. Woods is from Michigan and has no possessory interest in Apartment 14D. Mesha Woods has consistently testified that she was unaware of Mr. Woods' presence in the apartment on the night in question, that Mr. Woods was not staying or sleeping in the apartment that night, that she did not consider him an overnight guest on the night in question, that Mr. Woods was not supposed to be there when she and her children were going to bed, that Mr. Woods does not possess a key to Apartment 14D, that he does not pay rent or utility, cable, or internet bills for the apartment, and that he does not keep possessions at the apartment unless he is staying there. There is no evidence of record that he stored overnight accoutrements at the apartment on the night in question. While there is evidence which suggests that Mr. Woods "frequented" Apartment 14D, that he had stayed there overnight in the past, and that Mr. Woods is a family member who is generally welcome in Mesha Woods' apartment, the evidence as a whole tends to indicate that Mesha Woods would have been aware if Mr. Woods was an overnight guest in Apartment 14D on the night in question, and Ms. Woods has, again, testified consistently that Mr. Woods was not staying in the apartment on the night in question. The Court finds that the evidence before it overwhelmingly supports a finding that Mr. Woods was not an overnight guest in Apartment 14D

on the night in question, and that his expectation of privacy was not objectively justifiable under the circumstances presented on the night in question.[2]

Further, even if the Court had found that Mr. Woods did have a legitimate expectation of privacy in Mesha Woods' apartment on the night in question, the Court finds that the record before the Court establishes, by a preponderance of the evidence, that Mesha Woods, the lessee of Apartment 14D, consented to the search at issue, and that such consent was voluntary and was not coerced. "In general, a 'warrantless entry into a person's house is unreasonable per se.'" *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). Consent, however, "is an exception to the 'requirements of both a warrant and probable cause.'" *Stabile*, 633 F.3d at 230 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

Consent to a search must be given voluntarily, *id.*, and must not be coerced, *United States v. Williams*, 898 F.3d 323, 332 (3d Cir. 2018). It is the Government's burden to demonstrate, by a preponderance of the evidence, that the consent was voluntary. *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009); *see also United States v. Upshur*, No. CR 20-00318, 2021 WL 1671687, at *2 (E.D. Pa. Apr. 28, 2021). "The individual giving consent must also possess the authority to do so, and 'the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.'" *Stabile*, 633 F.3d at 230 (citations omitted); *see also Minnesota v. Olson*, 495 U.S. 91, 99 (1990) ("From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host

---

[2] The Court also notes that Mr. Woods' Proposed Findings of Fact and Conclusions of Law inexplicably reference a conversation between Mr. Woods and his brother, *see* ECF No. 56, that finds no support in the evidentiary record presently before the Court.

*and those his host allows inside*."); *United States v. Peoples*, No. CR 20-267 (SRC), 2021 WL 1997383, at *4 (D.N.J. May 19, 2021) ("While an overnight guest may have a reasonable expectation of privacy in his host's home, that host is generally understood to maintain the authority to license others—including law enforcement—into the home, as well.").

With respect to voluntariness, the United States Court of Appeals for the Third Circuit has explained:

> "[W]e determine the voluntariness of a consent by examining the totality of the circumstances." We consider such factors as "age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter, the repetition or duration of the questioning; and the use of physical punishment." The "'setting in which the consent was obtained [and] the parties' verbal and non-verbal actions'" are also relevant. Finally, even though [the individual] was told she could refuse, the Government need not inform the subject of his right to refuse consent.

*Stabile*, 633 F.3d at 231 (citations omitted).

Initially, there can be no question that Mesha Woods, the lessee of Apartment 14D, had authority to consent to a search of the apartment. There is also no question that she was provided with a Miranda Rights Warning Form, and that she initialed next to each paragraph and signed the Form. Government's Exhibit 2, ECF No. 54-3. Mesha Woods was also provided with, and signed, a Voluntary Consent to Search Form, which indicates, inter alia, that: (1) she was informed of her constitutional right not to have a search made of Apartment 14D without a search warrant; (2) she was informed of her right to refuse to consent to a search; (3) she was informed she could revoke consent at any time; (4) having been so informed, she authorized police to conduct a search of Apartment 14D; (5) she authorized officers to take any property which is contraband or which may be used as evidence in criminal proceedings; (6) she was not under the influence of drugs and/or alcohol; and (7) she gave such permission voluntarily and without threats, pressures, coercion, or promises of any kind being made to her. Government's Exhibit 3, ECF No. 54-4.

13

Officer Toth testified, and the other Officers corroborated such testimony, that he explained the Voluntary Consent to Search Form to Mesha Woods and that the conversation regarding the Form was cordial and non-confrontational, and that there was no argument or debate with respect to that conversation. Mesha Woods was not restrained at any point, and the Officers' weapons were holstered during this conversation. The Officers testified that Mesha Woods appeared to be sober and of clear mind, that she exhibited no slurred speech, and that she showed no sign of intoxication or that she was under the influence of any narcotic. The Court finds that there is no evidence of record which indicates that Mesha Woods' consent was, on the basis of age, education, or intelligence, not voluntary. The Officers also testified that no threats, pressures, coercion, or promises were made to Mesha Woods during the conversation as to whether she would consent to a search of Apartment 14D. The Officers further testified that Mesha Woods did not revoke consent at any point, despite being informed that she had the right to do so.

The Court acknowledges that Mesha Woods testified that officers twice asked to search Apartment 14D, and that she initially refused because her children were asleep in the apartment. Tr. 54:15-55:17, ECF No. 58. Mesha Woods further testified that one of the officers stated that, if Ms. Woods did not allow the officers to conduct the search, the officers would get a warrant and would charge Ms. Woods for anything found in her residence, that she would go to jail or stay the night in jail, that her three children would be taken by CYF, and that she would be evicted from her apartment. *Id*. With respect to this testimony, the Court notes that Officer Toth testified that he informed Ms. Woods that, if she refused to consent to a search, Officer Toth would apply for and attempt to obtain a search warrant for the residence. He further testified that, prior to Mesha Woods signing the Voluntary Consent to Search Form, Officer Toth explained to Ms. Woods that anything found in the residence would be charged accordingly, and that the officers were mandated

14

reporters that were required to report anything that placed children in danger. The Court finds that Officer Toth's description of the possible consequences of the search at issue to Ms. Woods in this case does not, in this instance, render Mesha Woods' consent involuntarily given.[3] The Court finds Officer Toth's testimony as to this conversation credible, and further finds that the testimony respecting the general cordial and non-confrontational tenor of the conversation between Officer Toth and Mesha Woods to support the Court's conclusion. Mesha Woods' signature on the Voluntary Consent to Search Form, and that Form's clear, plain, and unequivocal language tend to corroborate the Officer's testimony in this important regard.

The totality of the circumstances in this case supports the Court's finding that the Government has established, by a preponderance of the evidence, that Mesha Woods had the authority to consent to the search at issue, and that she did, in fact, voluntarily consent to the search. Accordingly, the Court rejects Mr. Woods' arguments to the contrary.

### IV.     Conclusion

Because Mr. Woods did not have a legitimate expectation of privacy in Apartment 14D on the night in question, and because the search at issue was voluntarily consented to by Mesha Woods, the lessee of the apartment, the Court will deny Mr. Woods' Motion. An appropriate Order of Court follows.

BY THE COURT:

s/*Robert J. Colville*_____
Robert J. Colville
United States District Judge

---

[3] *See United States v. Henderson*, No. CRIM.1:06-CR-0234, 2010 WL 1565295, at *4 (M.D. Pa. Apr. 19, 2010), *aff'd*, 437 F. App'x 96 (3d Cir. 2011) ("In the instant case, Inspector Thomas did not overtly threaten or coerce Henderson, nor did she in any way taint the voluntariness of the consent. Rather, Inspector Thomas accurately informed Henderson of the current situation, and the possible outcome if she did not cooperate. The court finds the testimony of Inspector Thomas credible and further finds significant evidentiary value in her testimony. On direct examination, Inspector Thomas stated, 'No threats were made to take her children away. I just explained the circumstances that if, . . . we go in the house . . . I could not make any promises to her whether she would or would not be arrested . . . [but if she were to be arrested] . . . [a]t that point child protective services could be called because, therefore, no guardians would be present for the children.'").

DATED: October 25, 2021

cc:     All counsel of record

        Abdullah Woods
        #22338509
        Northeast Ohio Correctional Center
        2240 Hubbard Road
        Youngstown, OH 44505